Company. You may proceed. Thank you. Good morning. My name is Charles Kagey. I'm speaking on behalf of the appellants. I'd like to try to preserve five minutes, if I can. Morning. The principal question on this appeal, I believe, is did the Second Amendment          It did. It did. It did. It did. It did. It did. It did. It did. It did. It did. It did. It did. It did.      It did. It did. It did. It did. And I think there are two principal sub-issues to that. Did the Second Amendment complaint plead claims that were allowed under the earlier decision of the district court that the AGWA law proceeding had claimed preclusive affect? And, secondly, did that complaint plead claims that are cognizant under the Sherman Act? I think the answer to both those questions is yes. What the Second Amendment complaint says is if you look at an individual defendant, you will find that it has entered into a series of exchanges that have been made to the plaintiffs in the past. a sub-market of California, that those agreements taken together keep gasoline out of the hands of independent marketers and therefore raise the price of gasoline, that this happens in a geographic and product market in which defendant has market power by virtue of those agreements, and that, therefore, defendant has unreasonably restrained trade. Now, this is a claim that was allowed even with the preclusive effect of the earlier AGWALAR decision, because the claim in AGWALAR was the defendants agreed among themselves to enter into those exchange agreements, a per se offense. My concern has always been, obviously, we're on take two now, and I have the same concerns that I had last time in terms of exactly what AGWALAR does preclude. And it seems to me that AGWALAR went into the area of that there's not a conspiracy here. And so, I guess my question is in terms of, even though, yes, you can allege all of those, but if this case were allowed to go forward, what would your clients have to show to recover damages? And I guess then the next part of it would be, could a defendant be held liable for damages for entering into the exchange agreement, or would the defendants have had to have had some further action under the agreement? I mean, does there have to be, it seems to me that there's got to be something conspiratorial there. Well, there doesn't have to be, we have to be careful about the use of the term conspiracy, because it can mean a lot of different things in different contexts. It's a combination conspiracy or contract in restraint of trade, is what the Sherman Act says. And what we have here are contracts, which are not going to be per se illegal. We have contracts that a defendant enters into, a series of contracts with other defendants that have an effect on competition. Okay, but any one of those contracts alone, you can't get damages for that, right? So you have to have all of those contracts there. Any one of those contracts alone, we could get damages for if that contract was an unreasonable restraint of trade. But how do you get there? What do you have to show to tie them together? We have to show that they had an anti-competitive effect that outweighed any pro-competitive effect they had. That's the rule of reason. And that's a factual question. And that's what they have to show. It's not an easy thing to show. It's a difficult thing to show. But that's what they have to show. And at the pleading stage, you can't say that plaintiffs are incapable of showing that. That's what the problem is here. That is not the conspiracy that was ruled upon in Aguilar. In Aguilar, the Supreme Court said there's been an allegation that defendants agreed among themselves to enter into a series of exchange agreements, which collectively, among all the defendants, tied up the market. But the Supreme Court also said that what was not heard here and what we're not deciding on is whether those agreements themselves were unreasonable restraints of trade and should be judged under rule of reason. That they were specifically reserving for another time because it was not before them. And so that's what plaintiffs have to show here. And I'm not suggesting it's an easy thing for them to show. But I don't think that you can, on the pleadings, say that it's impossible to know. This isn't the average rule of motion. I mean, this lawsuit's been around for over 10 years now, this lawsuit. And the Aguilar case started before that. It was substantially litigated, a lot of discovery, a lot of information on the table. And I sit there and say, well, okay, I understand the theory of this. What's the economic, what makes sense as an economic theory as to how this can restrain trade? If you take as a given, as I think we must, that there's not a conspiracy to control supply or raise prices, then how can you explain behavior of the parties that results in a restraint of trade out of these contracts? Well, there's not a conspiracy to enter into the exchange agreements for that purpose, in effect. But there are the exchange agreements that were entered into. The situation, in a little broader perspective, is in about 1995, there was a changeover in the type of gasoline that had to be sold in California. And according to the complaint, there was a changeover in the way that the defendants agreed among themselves. And they agreed among themselves in such a way that each of them was able to draw on each other's carb gasoline within a given geographic region. And again, according to the complaint, this managed to satisfy the needs of the defendants, the major oil companies, and to starve the independent marketers, who used to be, according to the complaint, a major cause to keep prices down. And with the supply being limited to them, because now it is being so freely shared among the defendants, there's been a substantial change in the market. And defendants say, well, exchange agreements promote competition among the people who sign on to the exchange agreements. And that may or may not be true. But that's an allegation that the major marketers, the competition among them has benefited. On the other hand, the Second Amendment complaint says that the competition presented by the independent marketers has been greatly hampered. I still don't see how, what I'm struggling with is, I don't see how that your claim at its core is not a conspiracy claim. And then that gets me back. Because your theory of recovery seems to rest upon the existence of a web of exchange agreements that allegedly allow all of the defendants to engage in a precise sort of dance of give and take with the goal of maintaining the delicate balance of car production. And so I still don't see how it's not, you know, it's I guess it's the walks like a duck, talks like a duck.  Well, again, conspiracy is a term that can have a lot of meanings. And I suppose there is some way to characterize it as a conspiracy, but not the conspiracy that was in Aguilar. Well, how is it different than the conspiracy in Aguilar? The conspiracy in Aguilar was that the defendants, alleged in Aguilar, was the defendants themselves had a meeting of the minds. We all will enter into exchange agreements. And those exchange agreements, why we get them all put together, are going to restrain trade. Now, we're not allowed to suggest the defendants agreed among themselves. We're all going to enter an exchange agreement. All we are allowed to allege and what the Second Amendment complaint does allege is that Defendant X has decided to have an exchange agreement with Y, an exchange agreement with Z, an exchange agreement with A, and X at least has, even if Y, Z and A never made an agreement, has accomplished the same goal, which is to tie up the carb gas to such an extent that the independent market. How does that work? How did X, by entering these exchange agreements, tie up the supply of carb gas? Well, for example, the specific example is given in the complaint of Tosco and Chevron. When the time came to change over to carb gas, Tosco was going to change over to carb gas and make carb gas. And instead, they got into an exchange agreement with Chevron and the deal was that Chevron would supply their carb gas needs because they had a big refinery that made carb gas and Tosco would not make carb gas. And Chevron would take the non-carb gas and ship it outside of California because it can't be sold there. So as a result, because they could draw upon each other, less carb gas was being made. And the result is the spot market was dried up, the overflow gasoline, which easily went to independence before because there's only one type of gasoline and everybody could sell it in California, went to independent marketers and the market was continually destabilized. But after this exchange agreement came into effect and less carb gas was being made than was being made conventional gas beforehand, there's a restraint on competition. Now, again, it's a factual question. Did this happen across the board? The allegation is there, but until we reach a point where evidence is being presented, we're not going to see whether that's true. Let me ask you this, if and I'm not saying this is what the panel is going to do at all, but if if we were to say that the district court properly dismissed the second amended complaint, could you amend your complaint to allege anything more than you've done? I'm not absolutely certain, but I believe we could. I mean, I have not drafted up the third amendment complaint at this point. I think that it's possible to get more specificity such as was given with respect to the Chevron Texaco deal that I just mentioned, and it might be able to to make that allegation about some of the other defendants. Candidly, probably will not be able to be able to make a specific allegation against all the defendants at that level. But but more could be done. Yes. Well, I have to say one of the things that makes it difficult is I try to work through the concept is that is the current complaint basically says you've got what is it nine nine players and that each of them individually have done such things as to give them market power. I don't know of any market that's got nine players where each has market power. So it's the lack of specificity and the attempt in the current operative pleading to cover everybody, every place, everywhere in the whole state of California that makes it very difficult to understand how that could possibly work. Right. And I understand that. And I think that's a justifiable criticism. And it's a result of coming where we've we've come from with a complaint that was dismissed on the grounds that that the plaintiffs believe there was actually this all encompassing conspiracy, which takes care of that whole problem. And without that all encompassing conspiracy, we have to look at what the situation is. And the situation is that there were these agreements and probably some defendants gain market power from it and some didn't. And we're not in a position to to sort out which ones did and which ones did not. Some would probably fall by the wayside if that's if if we actually get down to the facts. But based on the facts that are at hand now, that's the best that can be done, which is is to steer the complaint, to make the complaint the way the district court always said we should make it. And that's what we've been done. And and then to sort out if there if these allegations are not going to stand up, although they could stand up for some of the defendants, then they can be dismissed. Counsel, let me ask you a question all the way from Idaho. Why isn't this simply a Twin Cities Fortner case? You don't have to have a conspiracy. All you need is a contract. And the contract under a rule of reason analysis has to have anti-competitive effects greater than any pro-competitive effects. And they talk about this in Fortner and and and Twin Cities. And it seems it's it's it's quite similar. Creating such a distinction would require courts to enforce arguably innocuous single contracts that belong to a pattern of contractual relationships that significantly restrain trade in a relevant market. Isn't that exactly what your theory is? I believe that is. Yes. That is my point. The other side. I'm sorry, I didn't I didn't understand your last remark. I didn't hear your last remark. The other if the other side heard me, they know what I'm talking about. OK. Let me ask about the nature of the contractor. Is there a restraint in the current contract? I mean, in the exclusive dealing context, you can understand there is a restraint. One party can't do anything. Is there a restraint in this context? There is a restraint only in the sense that that each defendant has a call on the other defendants. Each each contracting party is a call on the other defendants producing capacity. The restraint is that that can keep the product out of the hands of the independent marketers. So I would say not explicitly on the face of the complaint. The complaint doesn't say you shall not sell the independent marketers. But that is the effect. And that's what the plaintiffs will have to prove. So it is a restraint of trade in that sense. I think other than that, I would suggest that there are grounds for allowing amendment of the complaint if if the complaint fails in some form, because it does meet the criteria that the district court put out before it. It's also I think the easiest part of the of the argument is that dismissal with prejudice of the state law claim was incorrect because the district court found that it did not have jurisdiction over the state law claim. And once it found it didn't have jurisdiction, it could not dismiss the claim, make a dispositive ruling at all on it. But the state law claim is going to be revived if the Second Amendment complaint is revived on federal grounds. And for the reasons I stated here, I think that's what should happen. I guess if there are no further questions, I'd be happy to reserve my time. Okay. May it please the Court. My name is Hojun Huang. I'll be speaking for 18 minutes of our allotted 20-minute time for the defendants. And Mr. David Foster will be addressing, for the balance of that time, some unique issues relating to Tesoro Corporation. The dismissal of the complaint, the fifth complaint in this 10-year-old case, and the third that were filed in response to specific direction from the district court as to how to cure the defense. And the dismissal of the complaint was proper, and it was properly dismissed with prejudice, because throughout all that time, the plaintiffs have not stated a viable antitrust claim against the defendants based on those exchange agreements. And there are two primary reasons why plaintiffs failed to state a viable antitrust action that I will address today. One is the plaintiff's claims expressly and necessarily depend on a combination, contract, or conspiracy that was found not to exist in the Aguilar case in the state court. And I will get into exactly what the Aguilar court found and how it relates to the complaint. Second, on the merits of the claim as alleged, the plaintiffs don't have a viable theory under Section 1 of the Sherman Act, because what they're trying to do is to allege a combination that consists of these separate bilateral agreements, a series of them with a single defendant at a time. So there are nine separate conspiracies consisting not of a single exchange agreement, but a series of exchange agreement entered into by each defendant. And we submit that that's not a proper claim under the Sherman Act. Now, I turn first to the Aguilar case. The Aguilar case was a certified class action on behalf of all California consumers. It was disposed of on summary judgment, which was eventually upheld by the In the opinion by the late Justice Stanley Mosk, the court noted that, quote, the most prominent of plaintiff's theory and evidence in that case were the exchange agreements that the defendants allegedly had executed as a means of reducing, refining capacity, and driving supply away from the spot market. The court said, after looking at the exchange agreements and the alleged lack of refining capacity, that those agreements did not imply collusion. Based on an extensive summary judgment record, the court noted, totaled more than 180,000 pages. And the court made two observations, which I think are critical here. One, the court reviewed a 50-year worth of case law, federal case law, saying that the exchange agreements have been long recognized as pro-competitive in purpose and effect, enabling and facilitating companies to compete in the product and or geographical and or temporal markets in which they otherwise could not compete or would not compete as efficiently. And then the court said, doubtless, exchange agreements can be misused to structure a monophobe conspiracy. But the evidence here does not suggest such misuse. Now, Mr. Kage said the conspiracy that was deemed not to exist in Aguilar had to do with an agreement to enter into these exchange agreements among the nine defendants. That's correct, but that's not complete. What the Aguilar court found is that there was no agreement to misuse the exchange agreements once entered into to engage in a kind of the delicate dance of give and buy away from independent marketers. And I think that's- Let me stop you there and take kind of a half step further. Because as I understand the claim as articulated by plaintiffs today, they're forced to accept the finding or work around the finding that there's not a conspiracy to accomplish that. But what I think I heard them say is that they've got contracts and they've got anti-competitive effects because the contracts empowered the individual oil companies to make decisions that resulted in a constrained market and a more limited supply. So they can accept what you just said, that there's not a conspiracy to enter into the exchange agreements to accomplish that result. And still claim, but they've got these exchange agreements and the individual companies have so made their individual decisions such that the end result is a constrained supply market. And that, they allege, is an antitrust violation. Two aspects of that question I'd like to respond to. One is that they're still relying on a series of exchange agreements. So that leaves the question of whether the exchange agreement has to be looked at independently. Apart from other exchange agreements, even as to a single defendant. Or whether a single defendant's exchange agreements can be aggregated. And this is the Twin Cities point that Judge Trott raised and I'd like to get to that. But the first response to your question is that they don't in fact allege the exchange agreements themselves give any defendant market power, benign defendants in this market. If you look to the complaint, and that's what I mean when I said that expressly this complaint depends on a conspiracy allegation. If you look at the complaint and look at the market power allegation, it's a basically a parallel allegation with respect to all nine defendants. What they say is that it's the defendants of chief market power. Because in addition to their own refining capacity, and in addition to the exchange agreements that they enter into. But also coupled with the refining capacity of all of their contracting partners. And it's very important to focus on that. Because what they're saying isn't that the refining capacity, let's say of Shell, has 100,000 barrels of gasoline per day of refining capacity. That's not enough to create market power. That's not what they're alleging. Okay, Shell has a contract with ARCO, at least at one point did, that had 20,000 barrels per day changing hands in north and south. So let's add that. So you've got 120,000 barrels per day of capacity. Plaintiffs don't allege that's what gives Shell market power. It's only by coupling those two things with the entire refining capacity of ARCO. I don't know, I don't recall offhand what it is, but let's say it's another 100. That's what gives it market power. So there's a very subtle distinction. Take this example, I think the argument is that Shell, because it knows it can buy from ARCO, from Chevron, from whoever else is in the market, can rely upon that and not build additional refinery capacity for itself or build refinery capacity in other geographic areas, other parts of the state, because it has a reliable source of supply from the other companies. And as a result, Shell is not motivated to make a decision to add to the capacity in the market. And that's exactly why this is an efficient practice. That is, if any company looks at the marketplace and sees that there would be reliable sources of supply that would be more efficient, more economical, and therefore pro-competitive to acquire, rather than spending its own money to build up capacity, there is nothing wrong with that under the antitrust laws. And that's also another issue that was fully aired out. Can that rule of reason type determination, whether a given arrangement is pro-competitive or anti-competitive, can that determination be made on a Rule 12 motion? No, and that's the problem. You're talking merits now, and that's way down the line. The other side is going to come in and say you've blocked out all the independence that's resulted in an artificial price ceiling that you can't pull down. In a rule of reason case, you have to show that the defendant has a modicum of market power so that the contract the defendant has entered into is likely to have unreasonable restraint of trade. There are cases that, in the Ninth Circuit, that if you fail to plead the relevant market and the defendant's market power at the pleading stage, it is proper to dismiss. And what I was focusing on, what I am focusing on now, is how do they plead that element of market power? They do it by aggregate. Can't they do it by aggregation? They're not doing it by aggregating the exchange agreements. They're aggregating the exchange agreements, but they're also supposing that Shell, in this case, in this example, has some kind of a call, and I think Mr. Kagey used that word, not only on the 20,000 barrels that are under contract, but on the 80,000 or 100,000 barrels of capacity that exists out there. And therefore, it is only by virtue of that aggregation which goes beyond the exchange agreement, which is why it's necessarily the case that the plaintiffs are relying on a conspiracy theory to say any defendant has any market power. Now, if the exchange agreement is the only combination at issue in this case, and Shell has no ability or no other agreement, we can use the neutral term combination, no other concert of action with ARCO or Chevron to have a call on the balance of the refining capacity of these other companies beyond the contractual commitment, then the plaintiff's theory on its face doesn't work. It's only by virtue of this unspoken collusive arrangement to have to utilize that uncommitted capacity in a somewhat joint manner that the plaintiffs are saying they have market power. Well, Shell doesn't need the whole capacity to meet its own needs. I mean, I think the theory the plaintiffs are offering, and I'll be very candid, I have a hard time understanding how that can actually work and can be proven. But I'm, I think, to some degree constrained by the fact that we are on a motion to dismiss. So I'm trying to figure out, is there anything that lets us examine the economic soundness of a theory at this stage? Because it seems to me what they're saying is that you've got this group of agreements entered into perhaps for entirely efficient, pro-competitive reasons, but they're there. And now the companies can look around and say, well, by virtue of these agreements, we can behave in a way that actually benefits us by limiting supply, or at least by making sure that oversupply doesn't make it to the market. Now, that's the theory I hear. What is it that makes that legally defective at this stage? Well, the latter half of the theory that you outlined, Judge Clipton, I think is precluded by Aguilar, because they're not allowed at this point to say that we have misused these agreements to keep supply out of the market. I mean, they can only rely on the fact of the agreement. I don't see how Aguilar works at all, because I'll read you from Aguilar that talks about the allegations and says, a conspiracy among competitors that is unlawful per se, without regard to any of its effects. That's all that we're dealing with in Aguilar. So a rule of reason case is not precluded by Aguilar. Where am I wrong? Well, the district court did rule in the summary judgment order, which is not challenged. What's not challenged then is not being challenged now. That even though the rule of reason theory and per se theory are different, as long as you're relying on the same concept of action element, then it is precluded. But let me get to the 12B6 point. I think the Supreme Court's decision in Twombly v. Bell Atlantic is very instructive in that regard. The case teaches that a court approaching a 12B6 motion does not need to check at the door basic economic common sense and logic in order to indulge a speculative pleading that while maybe consistent with an antitrust violation, does not plausibly suggest it. The Supreme Court made it clear that in looking at under Rule 8, not a special pleading rule to antitrust laws, looking at whether the plaintiff has stated a plausible entitlement to relief, the court can look at the allegations in light of common experience, common economic experience, and, in fact, examine the allegations of conspiracy in that case and found that it didn't fit with common economic experience and what history teaches about the market in question. And this is not new. And the district court was right to apply logic and common sense in looking at these agreements and saying the only way this could work to actually restrain competition, restrict supply going to independent marketers, is if there is some broader agreement behind it that allows the oil companies to balance their production and supply. Well, maybe, but consider this. We've used the example of Shell, so I'll just go ahead and say Shell. Shell's sitting there and knows it has exchange agreements with all these other companies, so it's not going to need to build additional refinery capacity for itself to meet the needs of its dealers. And that's a rational decision on the part of Shell. They don't have to conspire with anybody else to let the market continue to operate because they can fairly anticipate that Chevron and ARCO and whoever else is in the market is going to stare at the same market and say, well, we don't have to build additional capacity either because we've got all these exchange agreements that meet the needs of our dealers. So you don't need to form a conspiracy at that stage, but you may have a circumstance where the individual companies acting individually can take advantage of this, I'll call pre-existing set of agreements, so that they can make decisions that work for themselves and also make sure that they don't have oversupply in the market. There is no, however, there is no agreement not to produce more than what, not to have overproduction, or to decide to allocate more. Even by your theory, more isn't being produced. One of the frustrating things about antitrust in lots of contexts is the competitive market and constrained markets can look exactly the same because perfect efficiency and perfect inefficiency may have a lot of similarities. There's not oversupply. I mean, the argument being made by plaintiffs factually that have to prove up is that the independents are squeezed out because there's not the oversupply that there used to be. And there's not the oversupply that there used to be because the individual refineries making their own decisions can decide we don't need to build any more because these exchange agreements take care of the needs of our dealers. Now, I'm not sure that's a viable economic theory. And so that's why I'm saying to you, okay, what is it about that that falls under a rule of reason type analysis in the antitrust laws that we can entertain at this stage of motion to dismiss? I would make one last point on that issue, which is that the plaintiffs do allege that there is a broader understanding behind these exchange agreements. They say defendants have used the exchange agreements to pool and coordinate production, to share market power, to coordinate and strategically use refinery maintenance, and to effect common management of multiple refineries. So as the plaintiffs do. Okay. Then let's say that that does get into the conspiracy. And so then that knocks out this complaint. Then why wouldn't they be able to amend it to allege Judge Clifton's theory? And that theory is what I'd like to address next, which is the plaintiffs admit that single they're not relying on single exchange agreements in isolation. They are relying on a single, all of the single defendants' agreements in the aggregate. And I would submit to you that that is an improper theory under the Sherman Act, under a Section 1 claim. The Section – there's a difference between Section 1 and Section 2 that we have to be aware of. Section 1 speaks to the reasonableness of a contract, combination, or conspiracy. It doesn't look to the defendant and says whether the defendant is liable or acting unreasonably. It looks to the contract, combination, or conspiracy. Section 2, on the other hand, focuses on the single defendant conduct. And that's clear from the text of the agreement – text of the statutes themselves. Now, what is the contract, combination, or conspiracy in this case, the concept of action element that they have to meet? An exchange agreement is a contract. Therefore, one exchange agreement meets the concept of action element. Two exchange agreements entered into by Party A with Parties B and C, do those together constitute a contract, combination, or conspiracy when there is no agreement among all three to enter into these agreements and there is no collusion as has been ruled upon in Aguilar? Here, the defendants are trying to mix and match. They're taking the concept of action element that consists of a bilateral contract and then saying, oh, but the unreasonable effect arises out of multiple bilateral contracts without alleging, and without being able to allege, in fact, under Aguilar, that this broader combination has to be considered. Let me focus on that and also assure Mr. Foster he's going to get his two minutes because we're taking longer here. This is a difficult and complicated case. Why isn't aggregation permissible under Twin Cities, which was, at least in part, a Sherman Section 1 case? Right. I think Twin City, it was an unusual case. I think the court said it was not adopting a generally applicable rule of Section 1 aggregation with respect to all contract. The court said at least by saying what it does, it's suggesting something other than what you're arguing, which that Sherman 1, by definition, is a single contract. You can't aggregate. Well, at least in one set of facts, our court has said that you can. There are, I think there are many differences. Let me focus on a few of them. I think the nature of the contract, that issue, was very different. In that case, we had an exclusive franchise agreement that was 33 years of duration that followed the franchise from Philadelphia to Kansas City to Oakland. And there was also finding by the district court that the defendant engaged in other predatory conduct in obtaining that agreement. That's not what we have here. Those are all atmospherics, though. The general theory is that you can use aggregation to get beyond an individual contract. It seems that that's precisely what you've got going in this case. Let me ask you this question. Do you need always a conspiracy to prove a rule of reason violation? You need to meet the concept of action element. And that's why I think. Right, but you don't need, but you do not need a conspiracy. You can simply use a contract and say under a rule of reason analysis, that's a violation because it's anti-competitive effects exceed its pro-competitive effects. Is that right? That's correct. And the question here is, what is the appropriate contract? I had the benefits of having Judge Arita, Professor Arita explain this to me. He could explain this even to dense third year law students. You don't need a conspiracy to pursue a rule of reason analysis. That's correct. And the question here is, what is the proper contract to be looked at? But on the, on the aggregation point. That's where, that's, that's where you get into aggregation. And that's what Fortner says. You don't want to be locked down to a single contract when there's a pattern that has the effect of wrecking competition. And in Twin Cities, what the court actually did, the aggregation that was actually done in that case was, the court aggregated all of Sports Service's contracts to determine the market power issue. And by adding them all up, it determined that the, the Sports Service had 24% market, market share. And I guess the court viewed that as sufficient to give Sports Service market power. It was not the aggregation. What, what, what was the aggregation in the Fortner case? The aggregation in the Fortner case was the tying agreements. The, the tie, each tied sale constituted a contract, which were then aggregated to see if there was a substantial foreclosure in that market. What's the vice in allowing aggregation here for any purpose? Well, the aggregation here would be very different. This is a, unlike an exclusive dealing arrangement that's, has, as the district, district court recognized as a discrete anti-competitive effect, or a tying agreement that involves coercion. This, these contracts don't foreclose anything other than the sense that any contract does. If I sell my house to somebody, nobody else can buy it. But, but I'm not selling the, I'm not, I'm not imposing any restraint on the buyer as a result of this contract. But as, but here's the, I guess the practical effect of this is this. If defendant A and defendant B contract to enter into an exchange agreement. Later, defendant A enters into contracts with defendant C, defendant D, and defendant E. The AB contract by itself is not illegal. It doesn't have any appreciable impact. At some point, defendant A enters into additional contracts that when you stop, start to aggregate the two and the three and the four contracts, at some point it becomes, it tips over the scale and becomes an unreasonable restraint. That under this- Only if, only, only if it's, if it's anti-competitive effects of the aggregated situation exceed the pro-competitive reasons for it. That's exactly right. And defendant B in this context, having entered into the AB contra, contract in the first place, at a later point because the aggregation now has more unreasonable effects, becomes guilty of a felony under section one. The, the rule that they're advocating here, which should not be expanded beyond, I think, the facts and the circumstances of, and the kind of contracts that were at issue in, in Twin City and Fortner, that would lead to a situation where companies enter into bilateral independent contracts that are at best at neutral or even pro-competitive. At some point, due to, due to conduct that they have no control over, may not even have knowledge over, become a violation of the Sherman Act that the company would be liable for. This is exactly what's going on in this case. They're looking to establish ARCO's liability by ARCO's contract with Shell and Ultramar and Costco and so on. And then, if the ARCO-Shell contract becomes illegal, then Shell is liable on that same contract. And, and I, I think that would be, that would be an untenable situation, that we should not create unless it's needed. And I think Twin City is certainly distinguishable. And I also would say, in the Dixon case from the Fourth Circuit, the Microsoft case, where the court refused to aggregate Microsoft's OEM licenses separately with Compaq and Dell and others, I, I think obviously there is no need for a, an unnecessary circuit split on that. And I think the Dixon case correctly recognized that in, in section one context, you have to look at the contract combination of conspiracy and then judge its effect rather than. You're, the other side says you misrepresent the Fourth Circuit case. What's your answer to that? I think what they said about the Fourth Circuit case was that Dixon did not seek to hold one OEM liable contract with, for contract of another OEM with Microsoft. That's precisely what they did in Dixon. Compaq was going to be held liable. They were a defendant, and so was Microsoft. Compaq was going to be held liable for all the other contracts that Microsoft had entered into with other OEMs, including Dell. They also say that complaint doesn't seek to hold one defendant liable based on the contract of the others. Well, it, this complaint. Well, it absolutely does. Each counterparty is liable under section one. Every person who shall make any contract or engage in any combination, and hereby declare to be illegal, shall be deemed guilty of a felony. So in the situation I was describing, Shell would be liable because Arco entered into other contracts with Exxon and Tosco and who have you, even though there is no broader conspiracy. I don't think that's the, I don't think Twin Cities compels us to go there, and I don't think we need to go there. I'm already out of time. I appreciate your willingness to stay with us. We'll give Mr. Foster his two minutes. Good morning, and thank you for my two minutes, which I will adhere to. May it please the court, I'm David Foster with Fulbright & Jaworski, which represents defendant Napoli Tesoro Refinery and Marketing. We agree fully with the points made by Mr. Wong and rise solely to underscore one additional point about Tesoro, which is that as to Tesoro, this complaint does not even allege an illegal exchange agreement, let alone any purchases from Tesoro or its contractors that could have been affected by an illegal exchange agreement. Now the plaintiffs, and this comes, of course, straight from the face of the complaint, the 44 alleged exchange agreements that are listed in Exhibit A of the complaint, none of which mention Tesoro. Now the plaintiffs in their brief here argue that even if they lack standing under Illinois BRIC, therefore, to pursue damages against Tesoro, they can still pursue injunctive relief as indirect purchasers. There's a major problem with that, which is their complaint again. Their complaint in paragraph 40 expressly says that they represent a class consisting of direct purchasers. That same paragraph 40 specifically excludes indirect purchasers from the class. The plaintiffs also argue in their brief here that if they do not have standing to sue Tesoro, the court should allow the intervention of some plaintiff who does have standing to sue Tesoro. That, of course, is not the law. There never was and is a plaintiff in this case that was seeking to intervene. But beyond that, plaintiffs who lack standing in class actions cannot proceed with class action in hopes that a plaintiff will show up later with standing to sue the defendant in question. Best evidence of this, best authority perhaps on the point besides this court's authority in La Mer, is the very authority relied on by the plaintiffs in their brief Haas v. Pittsburgh National Bank from the Third Circuit in 75. Citing your opinion in La Mer, the court there stated with specific regard to multi-defendant class actions, quote, a nominal plaintiff may not maintain an action on behalf of a class against a specific defendant if the plaintiff is unable to assert an individual cause of action against that defendant, end of quote. That's on page 1096, note 18 of Haas. For those reasons, we believe that as a matter of law, the plaintiffs do not have standing to pursue this complaint against Tesoro and it should have been dismissed on that ground in addition to its failure to allege a claim against any defendant. Thank you. Roberts. Thank you. Mr. Kage. Yes. I don't think I'll take a lot of time responding to many of the specific points that were made here because I think the Court's comments from the bench largely reflected what I would have said as to many of them. But I would like to at least address the question or the argument raised that there's a problem with aggregation because that might mean that innocent parties get swept up in circumstances where they shouldn't be. If I understand the example correctly, we talk about A having separate bilateral contracts with B, C, and D. And the Second Amendment complaint alleges that A, by virtue of having contracted with B, having contracted with C, and having contracted with D, now has market power and is able, through this contract, to act unreasonably and restrain trade. The question then is, should B be held liable in that circumstance? And we don't contend that B is liable in that circumstance. I don't think it necessarily follows that if B has contracted with somebody who has put together contracts that restrain trade, that B is restraining trade by being in that one contract. Now, it's true that the way the complaint is now constructed — But how does B become responsible? B would be responsible and be liable and be required to pay only if the separate allegation in a different part of the complaint as to B is true, that B entered into contracts with X, Y, and Z, or A, B, and C, or whoever B entered into contracts with. And those contracts together gave B sufficient market power, and those contracts together were not reasonable to restrain trade. But that wouldn't be because he contracted with A who had contracted with B, C, and D. It would have to be a separate proof against B based on the contracts that B entered into. And now — Well, let's take the theory that I've put in your mouth. I'm not sure it's a theory you intended to articulate, but it's one I've put to opposing counsel. As I understand the allegations, you accept that there's not proof of a conspiracy to accomplish these anti-competitive ends, and so you are forced to allege that the individual defendants are operating in their own interests, making individual decisions, but recognizing the existence of exchange agreements, wind up behaving in a way that produces anti-competitive  Now, am I on your case? I think we're together so far. Okay. So then — and also, intent in terms of the antitrust law is usually a factor that comes up, or under our precedent at least, comes up at the stage of the rule of reason analysis. Well, can you have an antitrust violation when — we'll call them the nine separate players here — are making individual decisions in their own best interests that produce an efficient market where there's not oversupply, but in a context where there were these exchange agreements which had been entered into for pro-competitive reasons exist? Does that constitute an antitrust violation? Well, it can constitute an antitrust violation if the defendant you're looking at entered into these agreements, and predictably they had this effect that's anti-competitive, and it did. The question of whether it's intent is sort of interesting because that was the grounds earlier complaint was dismissed, and it was raised before this Court at that time that the law — there was new law that apparently indicated that intent was not a required element of proof, but that was not addressed by the Court because the Court reversed it on other grounds. And this complaint alleges the intent, alleges the intent of the individual defendant in entering agreements with a series of other companies to restrain trade. Well, intent individual. That is, not intent as in the sense of I know what this other guy is going to do because we have an agreement that this other guy is going to go along with me and control supply. I mean, these agreements don't empower me, A, to control the supply of anybody else, but I'm counting on the fact that it's in everybody's individual interest not to flood the market with what becomes cheap gas. Or counting on the fact that I can call on it and make a superior call to the spot market or to the independent market and prevent circumstances where there would be a destabilization of the market price. Because I have a contract with B, C, and D, and that allows me to do that and to head off these situations that otherwise might undercut competition. That's it. It seems like your theory depends upon inefficiency in the market, on oversupply. And you're basically saying these arrangements permit the operation of a highly efficient market that doesn't result in oversupply, and somehow that becomes a violation of the antitrust laws. Efficiency, like a lot of things, is in the eye of the beholder. If you are the nine major oil companies, it's efficient to make exactly enough oil for the nine major oil companies to sell, enough gasoline for the nine major oil companies to sell, and no more. And it's very inefficient to make more than that because it's going to get in the market and sell for less. But that's the sort of inefficiency that's exactly what the antitrust laws are supposed to encourage. And yet, individually, the companies are allowed to make their supply decisions. There's nothing that requires them to supply more because it might result in an overall market benefit by aiding the independents. Absolutely. A completely independent, independently won oil company doing so, they have that right under the antitrust law as long as they're not a monopoly and nobody's alleged to be a monopoly here. But on the other hand, if you enter into contracts that allow you to head off to competition that otherwise would have happened, if you enter into anti-competitive agreements with other producers, which is what is alleged here, then that can run afoul of the antitrust laws. And that's what the Second Amendment complaint alleges. Or what the Third Amendment complaint might allege if you're given an opportunity to make the Third Amendment complaint. Exactly. I might say briefly with respect to Tesoro, the allegations against Tesoro are very vague in the Second Amendment complaint because Tesoro entered the market after the Aguilar discovery. And the allegations are made under information and belief. But they do allege that Tesoro had inherited exchange agreements that went from Ultramar to Valero to Tesoro and that some of the plaintiffs did buy from trading part from exchange agreement partners of those exchange agreements. Now, plaintiffs aren't crazy. If Tesoro doesn't have these agreements, they don't want to waste their time litigating against them. And Tesoro can come and say, you know, open the books and say, we don't have these agreements. Or if plaintiffs are obstinate, that's an easy summary judgment. We don't have agreements. Out. But the complaint itself on information and belief alleges enough for Tesoro to be there. And what I just suggested hasn't happened. Does the complaint allege a time period? I should have remembered. But is there a duration specified as to when the conspiracy or is it alleged to be continuing? Well, it alleges with the beginning of the carb gas era to the present, which is about 1995. And, of course, because this complaint has been hanging around a long time, it's now covered a large time period. No other questions? I guess my time is up. Apparently not. We appreciate the argument from all counsel and the very persuasive briefs. The case just argued is submitted. And we are in recess for the day. Thank you.
judges: Trott, Clifton, Callahan